UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHN F. HALL,                        )
                                     )
            Plaintiff,               )
                                     )
       v.                            )        No. 4:08 CV 576 SNLJ
                                     )                        DDN
                                     )
 MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,     )
                                     )
            Defendant.               )

**REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final
decision of the defendant Commissioner of Social Security denying the
application of plaintiff John F. Hall for disability insurance benefits
under Title II of the Social Security Act, 42 U.S.C. § 401, et seq. The
action was assigned to the undersigned United States Magistrate Judge
for review and a recommended disposition under 28 U.S.C. § 636(b). For
the reasons set forth below, the undersigned recommends that the ALJ's
decision be reversed and remanded.

**I.  BACKGROUND**

Plaintiff John Hall was born on February 10, 1961. (Tr. 44.) He
is 5'7" tall with a weight that has ranged from 158 pounds to 193
pounds. (Tr. 131, 221, 570.) He is married and has one adult child.
(Tr. 92, 354.) He completed the ninth grade, and never received a
G.E.D.[1] (Tr. 28.) He last worked as a cook. (Tr. 28.)

_____

[1]Hall answered "no," when asked if he had received special
education classes. Yet, the next page of his application notes that he
attended special education classes in high school. (Tr. 136-37.)

On November 8, 2005, Hall applied[2] for disability insurance benefits, alleging he became disabled on November 21, 2005,[3] on account of leg pain, arthritis, diabetes, heart problems, and breathing problems. (Tr. 11, 44-45.) He received a notice of disapproved claims on December 8, 2005. (Tr. 45.) After a hearing on June 27, 2007, the ALJ denied benefits on July 19, 2007. (Tr. 8-21, 25-43.). On March 21, 2008, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 2-4.)

## II.  MEDICAL HISTORY

On an unknown date, Hall completed a disability report. He noted being unable to work because he had chest pain, body pain, and was short of breath. He also noted suffering from leg pain, diabetes, arthritis, heart problems, and breathing problems. The impairments started bothering Hall in 2000, but he did not stop working until August 7, 2005. He stopped working because he had to stay home and care for his wife. He had worked as a sauté cook or broiler for the past twenty years. As part of the jobs, he walked and stood for eight hours a day, frequently lifted up to forty pounds, and was in charge of restocking supplies, and carrying them to the workstation. At the time of the report, Hall was taking Aspirin and Nitroglycerin for his heart problems, and Ibuprofen for pain.[4] (Tr. 131-37.)

On an unknown date, Hall completed a disability report appeal. He noted the pain in his leg, hands, and feet had gotten worse since

_____

[2]Hall had applied for disability benefits once before. His earlier application for benefits was denied on January 6, 1999. (Tr. 128.)

[3]On June 25, 2007, Hall changed his alleged onset date from December 20, 2004, to November 21, 2005. (Tr. 11, 91, 92, 127, 132.)

[4]Aspirin is used to reduce fever and relieve mild to moderate pain. It may also be used to reduce pain and swelling in conditions such as arthritis. Ibuprofen, or Motrin, is an anti-inflammatory drug used to relieve pain and swelling. Nitroglycerin is used to treat chest pain due to angina or heart attack. WebMD, http://www.webmd.com/drugs (last visited July 30, 2009).

December 2005, and that he had neuropathy in his legs, hands, and feet.[5] At the time he was taking Aspirin, Nitroglycerin, Ibuprofen, and Gabapentin for neuropathy.[6] Hall noted that the side effects from the medications caused him "significant problems," but did not elaborate. (Tr. 150-56.)

On October 14, 2003, Myung Kang, M.D., reviewed an x-ray of Hall's chest. The x-ray revealed his heart, lungs, mediastinum, and thorax were all within normal limits. (Tr. 194.)

On November 8, 2005, D. Cogorno completed a disability report after conducting a face-to-face interview with Hall. Cogorno did not observe Hall have any difficulty breathing, concentrating, talking, sitting, standing, walking, seeing, writing, or using his hands. Cogorno noted that Hall was never out of breath and only rubbed his chest in response to questions about why he could not work. "He may have problems, but they were not evident." (Tr. 128-30.)

On November 17, 2005, Hall went to the emergency room, complaining of tightness in his chest, and difficulty breathing. A physical examination showed Hall's head, eyes, ears, nose/mouth/throat, neck/thyroid, lungs, heart, and abdomen were normal. (Tr. 169-72.)

On November 21, 2005, Hall went to the doctor, complaining of bilateral leg pain and left arm pain, though the left arm pain was not present during the visit. Hall first had chest pain and difficulty breathing in December 2004. The symptoms were interfering with his daily activities, particularly because of the leg pain. A physical examination showed his motor skills were 5/5 throughout, and his

---

[5]Peripheral neuropathy is a condition in which the nerves beyond the brain and spinal cord (the peripheral nerves) fail to function properly, resulting in pain, loss of sensation, or inability to control muscles. There are numerous causes for this common condition, among which is diabetes mellitus. Neuropathy can affect the sensory, motor, or autonomic nerves, and the symptoms will vary according to the type of nerves involved. Christl v. Astrue, Civil Action No. 08-290, 2008 WL 4425817, at *3 n.7 (W.D. Pa. Sept. 30, 2008).

[6]Gabapentin, or Neurontin, is used to help control seizures. WebMD, http://www.webmd.com/drugs (last visited July 30, 2009).

reflexes were symmetric.  His gait was antalgic.[7]  The doctor diagnosed Hall with diabetes and likely peripheral sensory neuropathy, due to a metabolic or inflammatory cause.  His eyes and joints were abnormal, due to numbness and paresthesias.[8]  His ears, head, lungs, heart, and edema were noted to be normal.[9]  Hall was discharged from the clinic and told to follow up with a neurology primary care physician.  (Tr. 187-89.)

On November 25, 2005, Hall completed an adult function report.  He lived in a house with his wife, and in a typical day, ate, watched television, and sat on the porch.  Because of his legs, Hall had difficulty getting out of the bathtub.  Hall could sometimes make himself a sandwich, and reported doing some chores, like making the bed and straightening up the rooms.  He could not stand on his legs for very long, and did not drive because of the problems with his legs.  He could not handle money because his hands cramped up and gave him problems.  Except for medical appointments, Hall did not go anywhere with regularity.  He believed he could only walk about ten minutes before becoming short of breath.  He was able to get along with others, and had never been fired from a job because he could not get along with others.  Hall's only routine was watching television.  Hall reported using a cane, but noted that a doctor had not yet prescribed its use.  (Tr. 139-46.)

On December 2, 2005, Jesse Poblete, M.D. reviewed the results of a stress test.  The test showed Hall had no definite ischemia, but that there was mild hypokinesia of the left ventricular wall.[10]  (Tr. 252.)

---

[7]An antalgic gait refers to a posture or gait assumed in order to avoid or lessen pain.  See Stedman's Medical Dictionary, 65, 91 (25th ed., Williams & Wilkins 1990).

[8]Paresthesia is an abnormal sensation, such as burning, pricking, or tingling.  Stedman's Medical Dictionary, 1140.

[9]Edema is an accumulation of watery fluid in cells, tissues, or cavities.  Stedman's Medical Dictionary, 489.

[10]Ischemia is local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply.  Stedman's Medical Dictionary, 803.  Hypokinesia refers to diminished or slow movement.  Id., 751.

- 4 -

On January 23, 2006, Hall went to the doctor for a follow-up, complaining of numbness in his hands and legs. A physical examination showed Hall had full strength proximally, but only 4/5 in his hands and feet. His gait was slow. The doctor diagnosed Hall with peripheral neuropathy, and noted that the laboratory evaluation did not reveal the underlying etiology of the problem. Hall was to be treated symptomatically, and was given a prescription for Gabapentin. (Tr. 227-28.)

On March 27, 2006, Hall went to doctor for a follow-up, complaining of back, leg, arm, and hand pain. The notes indicate he was not compliant with his medication, stating it was not helping him. Hall was observed walking with a cane for support. A physical examination noted "some embellishment." He tested positive for allodynia, but negative for Romberg's sign.[11] He was diagnosed with sensory neuropathy. (Tr. 221-22.)

On May 15, 2006, Hall went to his neurologist, complaining of leg and arm pain, which he rated 8/10. Hall had been started on Elavil and showed some improvement.[12] He could not afford the Neurontin, but recently got Percocet.[13] His complaints were unchanged, and was still complaining of numbness and tingling in his feet and hands, and pain in his legs and arms. A physical examination showed Hall was pleasant and comfortable, with full motor strength. He had an antalgic gait and could not walk on his toes or heels. He was diagnosed with neuropathy, which was stable with some improvement on Elavil, and gastroesophageal reflux disease (GERD). (Tr. 218-19.)

---

[11]Allodynia is the distress resulting from painful stimuli. Stedman's Medical Dictionary, 47. Romberg's test has a standing patient close their eyes. If closing the eyes increases the patient's unsteadiness, the test reveals a loss of proprioceptive control. Id., 1421.

[12]Elavil, or Amitriptyline, is used to treat mental or mood problems such as depression. WebMD, http://www.webmd.com/drugs (last visited July 30, 2009).

[13]Percocet is an opiate-type medication, used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited July 30, 2009).

On July 6, 2006, the Missouri Department of Social Services found Hall was "permanently and totally disabled" and eligible for benefits. The decision was based on Hall's diagnosis of progressive peripheral neuropathy of uncertain etiology, though there is little other explanation for the award. (Tr. 158-63.)

On July 29, 2006, Hall went to the emergency room, requesting x-rays of his knees and toes, because he had recently been diagnosed with neuropathy. Hall was ambulatory when he went to the screening area, and denied any trauma or pain while resting. At the same time, the notes indicated Hall's "assistive needs include restricted to using a cane." A physical examination showed his respiration was spontaneous, and his circulation was within normal limits. Hall was alert and oriented, with no edema. Flexion of the knees produced a grinding sensation with audibles, though he had full range of motion in all four extremities, was non-tender to palpation, and his distal pulses were normal. Laura Snyder, PA-C, diagnosed Hall with chondromalacia of the right and left patella, and pain in the knee joints.[14] He was discharged home in stable condition, and left in a wheel chair to get to his vehicle. At the time, Hall was taking Percocet, Amitriptyline, and Tramadol.[15] The medical notes indicated that no critical care was required. (Tr. 255-63.)

On July 31, 2006, Hall went to the doctor for a follow-up, complaining of bilateral knee pain for the past three to four years, but that had become worse since his diagnosis of neuropathy. He had difficulty walking, and complained of pain in his calves and a grinding sensation in his knees. A physical examination showed he had chest pain, but that his breathing sounds were normal, and his heart sounds and rate were also normal. His motor and sensory reflexes were intact and 5/5. The doctor diagnosed Hall with neuropathic pain and bilateral

---

[14]Chondromalacia is a cartilage irritation under the knee cap, that can cause pain. Climbing stairs and rising from a chair often aggravates the pain. Avoiding aggravating activities and engaging in exercise helps prevent further episodes. (Tr. 260.)

[15]Tramadol is used to relieve moderate pain. WebMD, http://www.webmd.com/drugs (last visited July 30, 2009).

knee pain, and referred him to a neurologist and orthopedist for the respective problems. He was to follow up as needed. (Tr. 209-10.)

On August 10, 2006, Jake LeBeau, M.D., saw Hall for an initial visit. During the visit, Hall completed a health risk history form. He noted taking Tramadol three times a day, Oxycodone three times a day, and Amitriptyline twice a day.[16] He rated his general health as poor, and noted his cartilage, knees, and toes were his principal health concerns. Hall noted his pain was constant, with aching and burning. Because of the pain, he had difficulty walking, getting dressed, and grooming. He had problems with his memory, difficulty eating, and was prone to falling. Hall stated he did not drink, smoke, or take illegal drugs. Hall's chief complaint at the time was burning and pain in his hands and feet. Hall had not worked since August 2005. A physical examination revealed Hall had full range of motion in the upper extremities, but 4/5 strength. He had decreased range of motion in his knees and toes, and 4/5 strength. He also had crepitus in both knees at the suprapatellar and infrapatellar areas.[17] He had no ulcers or lesions on his feet, legs, or hands. His psychiatric test indicated no issues, and that he wanted to get back to work. Dr. LeBeau diagnosed Hall with peripheral neuropathy, for which he prescribed Neurontin, and knee and hip pain, for which he refilled a prescription of Percocet. Hall said the Percocet helped his knees, but not his neuropathy. (Tr. 298-308.)

On August 10, 2006, Emily Smith, M.D., reviewed x-rays of Hall's hips, knees, ankles, and feet. The knee x-ray revealed the bones of each knee were intact and anatomically aligned without fracture, joint abnormalities, or joint effusions.[18] The ankle x-rays revealed the bones

---

[16]Oxycodone is a narcotic used to treat moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited July 30, 2009).

[17]Crepitus, or crepitation, refers to crackling, and can be the noise or vibration produced by rubbing bone or irregular cartilage surfaces together. Stedman's Medical Dictionary, 368. The patella is the kneecap. Id., 1149.

[18]Effusion is the escape of fluid from the blood vessels into the tissues or into a cavity. Stedman's Medical Dictionary, 491.

were intact and anatomically aligned without fractures, joint space abnormalities, or tissue swelling. The hip x-rays revealed the bones to be intact and aligned, without evidence of fracture or degenerative changes. The feet x-rays revealed the bones were intact and aligned without fractures, though there was moderate to severe joint osteoarthritis in the joints of each big toe. The other joint spaces were normally maintained. (Tr. 917.)

On September 11, 2006, Hall saw Glenn Lorde, M.D., complaining of leg and knee pain, erectile dysfunction, and urinary frequency. A physical examination showed Hall had full motor strength throughout, with no tremors. Walking on his heels and toes was painful, and he had an antalgic gait. Dr. Lorde diagnosed Hall with likely painful diabetic neuropathy, GERD, and chondromalacia. (Tr. 267-68.)

On September 14, 2006, Dr. LeBeau completed a referral form for the Rehabilitation Institute of St. Louis. Dr. LeBeau indicated he wanted Hall to receive a gait assessment, and to be evaluated on his need for a wheeled walker. (Tr. 278.) During an examination, Dr. LeBeau noted Hall had an antalgic gait with a cane, walked on his toes, had decreased sensation to light touch, and experienced pain on the soles of his feet. (Tr. 311.) Dr. LeBeau also referred Hall to a diabetic foot clinic. (Tr. 288.) That same day, Dr. LeBeau wrote a general "To whom it may concern" letter, explaining that Hall was a "newly-diagnosed diabetic with diabetes mellitus type 2." (Tr. 295.)

On September 16, 2006, Leigh Wilson, PT, completed an initial plan of care for Hall's physical therapy. Hall was scheduled for two sessions over the next two weeks. The treatment plan was to focus on gait training, and Hall's own goals were to "get around a little better." He had been walking with a cane for the past sixteen months. Wilson noted Hall tolerated treatment without incident and that the plan for the next visit was to continue gait training with the wheeled walker. (Tr. 279-84.)

On October 3, 2006, a discharge assessment from the Rehabilitation Institute noted that Hall was using a rolling walker and straight cane as an assistive device. Hall complained of pain throughout his body, 8/10, that was dull, sharp, numb, and throbbing. The pain was daily and

constant, and disturbed his sleep. (Tr. 277.) Hall stated he was feeling about the same as he had before physical therapy. He was going to get a diabetes shoe. Hall reported increased comfort and pace with a wheeled walker, instead of a straight cane. He was discharged. (Tr. 285.)

On October 12, 2006, Dr. LeBeau certified that Hall needed therapeutic shoes. He noted Hall had diabetes and a history of pre-ulcerative calluses. Dr. LeBeau believed that Hall would need the shoes for an indefinite period. Dr. LeBeau also wrote that Hall was to be fitted for a cane to improve his impaired gait. (Tr. 291-93.) That same day, Joan Frycka examined Hall's feet. There were no calluses or ulcers, but there was a bunion on the left foot. Muscle strength was within normal limits, but Hall's gait was described as a shuffle. Hall was to return in six months, or as necessary. After the evaluation, Hall's foot pain was 3/10. (Tr. 314-15.)

On November 28, 2006, Hall complained of a pain level of 10/10, since he had been out of pain medication for the past four days. (Tr. 352.)

On December 7, 2006, Hall saw John Clohisy, M.D., complaining about constant knee pain, that was worse after prolonged sitting and stair climbing. Hall did not have any recent trauma to his knees, had never undergone knee surgery, and denied any mechanical symptoms, such as locking, catching, or clicking. Dr. Clohisy noted a history of severe neuropathy. A physical examination showed Hall was in no acute distress, but that he had an unsteady gait. His lower extremities showed normal alignment and good strength, with full, free, and painless passive and active range of motion in his knees. There was no evidence of joint effusion, but there was tenderness to palpation at the patella of each knee. There was no evidence of locking, catching, or clicking with passive range of motion. There was also no evidence of instability to varus/valgus or anterior/posterior stress testing, negative pivot shift, or negative McMurray's sign.[19] He did have reduced sensation,

---

[19]Varus means bent or twisted inward, toward the midline of the limb or body. Stedman's Medical Dictionary, 1669. Valgus means twisted
(continued...)

consistent with peripheral neuropathy. X-rays of the knees, showed good joint space, that was symmetric, and showed no signs of degenerative changes, fractures, or other pathology. Dr. Clohisy diagnosed Hall with anterior knee pain in each knee. He instructed Hall on the use of anti-inflammatories, suggested Hall ice his knees each night, and that he start working on quadriceps strength-training. (Tr. 323-24.)

On December 7, 2006, Dr. Smith reviewed x-rays of Hall's knees. The x-rays revealed the bones were intact and anatomically aligned without fracture or spurring. There was mild narrowing of the medial compartment of the left knee, which might have represented early osteoarthritis. Otherwise, the frontal views of the knees were normal and there was no other evidence of any joint space abnormalities. (Tr. 322.)

On December 15, 2006, Hall saw Richard Sohn, M.D., complaining of painful peripheral neuropathy. Dr. Sohn had first treated Hall a year ago, when he complained of paresthesias and numbness in his limbs. His symptoms were essentially unchanged, though Hall did report "significant relief" from Oxycontin and Tramadol. Hall was in particular pain on this visit, having been out of Oxycontin for the previous two weeks. Hall said Neurontin and Lyrica were ineffective, and produced side effects. Hall was also taking Elavil, Metformin, and Viagra.[20] Dr. Sohn diagnosed Hall with diabetes with neurological complications, stable bilateral lower extremity neuropathy, with uncontrolled pain, "presumed painful diabetic neuropathy," and localized osteoarthritis in each foot, though stable. Hall indicated he was disabled, and that he did not do much all day. (Tr. 317-18.)

---

[19](...continued)
outward, away from the midline of the limb or body. Id., 1684. McMurray's sign is used to evaluate individuals for tears in the meniscus of the knee. Id., 1571.

[20]Lyrica is used to treat pain caused by nerve damage due to diabetes and shingles infection. It is also used to treat pain in people with fibromyalgia. Metformin is used to control high blood sugar. Viagra is used to treat erectile dysfunction. WebMD, http://www.webmd.com/drugs (last visited July 30, 2009).

A physical examination showed Hall's pulses were intact, with no edema, rashes, or lesions. He had full range of motion in his back, and no tenderness. His strength was 5/5 throughout. He had an antalgic gait, and was walking with the help of a walker. He said it was hard for him to stand up straight. Hall was compliant with his medication. Dr. Sohn noted that it was "NOT normal for [Hall] to have such good reflexes in the context of such pronounced sensory deficits and his report that he feels relief when bending over makes me concerned that we not miss a process in his spinal cord." Dr. Sohn filled out disability papers for Hall, refilled his Oxycontin medication, and gave him a prescription for physical therapy. (Tr. 318-20.)

On December 26, 2006, Hall saw Dr. LeBeau, for a follow-up of his hemorrhoids and diabetes. An examination showed Hall was not suffering from any fatigue or chest pain, though he had joint pain and tingling. Dr. LeBeau diagnosed Hall with hemorrhoids, which were currently inactive, pain, which was controlled by Tramadol, Elavil, and OxyContin, diabetes, peripheral neuropathy, which was controlled by the pain medication, and erectile dysfunction. Hall was using a walker and a cane, but he seemed "to be [doing] fairly well." Hall requested Dr. LeBeau's signature to obtain a buss pass and help with Call-A-Ride, and Dr. LeBeau completed the forms. Dr. LeBeau cautioned Hall about the addictive properties of OxyContin, and planned to discontinue his prescription when it ran out. Hall was on Medicaid, but was willing to pay for Viagra out of pocket. (Tr. 330-32.)

In January 2007, Hall went to prison. (Tr. 891.)[21]

On February 8, 2007, Hall completed an intake medical history form for St. Louis County Corrections Medicine. Hall indicated he had been in jail before, for two days, in 2002. He noted recent weight loss of twenty pounds. He had diabetes and had been shot in his right eye in February 1988. (Tr. 921.) Later that day, Hall saw Karen Nichols, FNP-C. Hall described his diabetes as severe, with an associated pain in the extremities. He also noted a gradual onset of arthritis, which was worsening. A review of Hall's symptoms showed he had lost weight since

---

[21]Hall's earliest prison medical records begin on January 25, 2007. (Tr. 891.)

being incarcerated and had not taken his appropriate medication. He had low blood pressure, which left him feeling weak and seeing stars. He walked with a halting, unsteady gait, and needed to use a cane for stability. Nichols diagnosed Hall with hypotension, diabetes mellitus, and rheumatoid arthritis (Tr. 570-73.)

On February 12, 2007, a medical note showed Hall had no symptoms of hypoglycemia or respiratory distress, and no complaints of arthritic pain, chest pain, or shortness of breath. (Tr. 857.)

On March 1, 2007, Hall saw Karen Nichols. Hall was feeling well with minor complaints. He was sleeping about ten hours a night. The notes indicate that the physical impact of Hall's impairments was severe. At the time, Hall was taking Amitriptyline, which made him sleepy, Metformin, and Ibuprofen. A physical examination showed Hall was in good general health, with no weight gain. His general appearance was cooperative and he was in no acute distress. He had normal posture, but chronic joint and muscle pain. He had full range of motion in all his joints, but decreased range of motion in his legs, with pain on movement. The pain had improved from his last visit. Nichols diagnosed Hall with diabetes, hypotension, arthritis, and hyperlipidemia.[22] (Tr. 517-20.)

On March 14, 2007, Hall saw Todd Parker, PA, with St. Louis County Corrections Medicine. Hall was complaining of leg pain and chronic peripheral neuropathy. Hall told Parker he needed something besides Motrin for his pain. A physical examination found Hall had a normal gait. (Tr. 499-501.)

On March 20, 2007, Hall saw Zachary Newland, DPM, with St. Louis County Corrections Medicine. A physical examination of Hall's feet showed generalized tenderness, with severe dryness and peeling. There was diffuse pain throughout both feet, stemming from the neuropathy. Newland diagnosed Hall with controlled diabetes, yeast infection in the

---

[22]Hyperlipidemia is the presence of an abnormally large amount of lipids in the circulating blood. Stedman's Medical Dictionary, 741, 884.

skin and nails, for which he ordered Lac-Hydrin, and idiopathic peripheral neuropathy, for which he ordered Neurontin.[23] (Tr. 487.)

On May 24, 2007, Hall saw Karen Nichols. At the time, Hall was taking Neurontin, Metformin Lac-Hydrin, Tramadol, Gemfibrozil, Amitriptyline, and Ibuprofen.[24] A physical examination revealed Hall had normal breathing sounds, a regular heart rhythm, normal lower extremities, normal neurologic coordination, and no lesions or deformities on his feet. He was walking with a cane. Nichols diagnosed Hall with diabetes without mention of complication, hypotension, unspecified idiopathic peripheral neuropathy, and mixed hyperlipidemia. (Tr. 405-07.)

On June 19, 2007, Dr. LeBeau completed a disability claim assessment for Hall. Hall suffered from diabetes, complicated by neuropathy, and chronic pain. The neuropathic pain in his hands and feet made walking difficult. According to Dr. LeBeau, Hall would likely need to rest for thirty to sixty minutes, two to three times a day. Dr. LeBeau believed Hall could not engage in even sedentary work, because his neuropathy prevented him from sitting or standing for more than an hour or two at a time. Dr. LeBeau also believed Hall's condition would prevent him from working for at least a year. Hall's nerve damage was permanent, and had occurred before he began treating Hall. (Tr. 364.)

**Testimony at the Hearing**

On June 27, 2007, Hall testified, by telephone, during a hearing before the ALJ. He had been arrested for an assault, and had been in

---

[23]Lac-Hyrdin is used to treat dry, scaly skin conditions, and can also help relieve itching from these conditions. WebMD, http://www.webmd.com/drugs (last visited July 30, 2009). Idiopathic denotes a disease of an unknown cause. Stedman's Medical Dictionary, 762.

[24]Gemfibrozil is used to help lower fats and cholesterol in the blood. WebMD, http://www.webmd.com/drugs (last visited July 30, 2009).

jail since January 2007.[25] He had previously served sixty days of shock time for a charge for unlawful possession of a firearm. (Tr. 29-30.)

Hall last worked as a cook, and had not worked any other jobs in the past fifteen years. In August 2005, Hall quit working as a cook at Outback Steak House so he could take care of his wife, who was on disability and needed dialysis. He had collected unemployment benefits before working at Outback, but did not apply for benefits afterwards. (Tr. 25-28.)

Hall suffered from diabetes, and took Metformin. Diabetes caused his feet and hands to swell, and he was going blind in his right eye. His knees gave out, and popped and cracked with movement. His back problems prevented him from standing straight up. He also complained of burning from arthritis and neuropathy. His hands ached and cramped up from arthritis. The burning in his knees radiated to his hips, and was constant. Prolonged standing and sitting was painful, and Hall normally sat with pillows. He also took Neurontin and Amitryptyline to ease the pain. In prison, he spent most of the day laying in his bed. His doctor had given him a cane and a walker, and physical therapy instructed him on how to use the devices. Hall did not go anywhere without his cane, and did not believe he could walk any significant distance. He also used a wheelchair at times. The prison had a special shower for him, the guards helped him wash his hair, and his cell was disability-equipped. (Tr. 28-35, 39.)

Hall believed he could only walk about ten feet before he had to stop and rest. He could not really stand on his feet at all, and had fallen in his cell once. He could not sit for long periods of time either. The most lifting he did was when he worked at Outback, where he would lift bags of potatoes and onions. In a typical day, Hall's wife took care of him. She prepared his food and did the grocery shopping. In jail, he spent most the day in his cell, laying down. If he needed to be in his uniform, the guards helped him change into it.

---

[25]On October 30, 2007, the Circuit Court of St. Louis County granted Hall's motion for a judgment of acquittal at the close of all evidence. The case was dismissed and Hall was ordered released. (Doc. 14.)

Hall was most comfortable laying down. (Tr. 35-39.) Dr. LeBeau was Hall's primary physician, but had not seen him since he had been in prison. (Tr. 31.)

During the hearing, Gary Weinholt testified as a vocational expert (VE). The ALJ had the VE assume that Hall could lift and carry twenty pounds occasionally and ten pounds frequently, required a sit-stand option, could occasionally kneel, crouch, and crawl, and could occasionally climb stairs and ramps. Given these restrictions, the VE testified that Hall could not perform his past work as a cook, but could perform work as a parking lot attendant (915.473-010) or cashier (211.462-010). If the VE assumed Hall could lift and carry ten pounds occasionally and less than ten pounds frequently, could stand for two hours in an eight-hour day, and sit for six hours in an eight-hour day, the VE testified that about half of the parking lot attendant and cashier jobs would still be available to Hall. If the VE assumed Hall needed to rest for thirty to sixty minutes at a time, two to three times a work day, Hall would not be able to perform the parking lot attendant or cashier jobs. (Tr. 39-43.)

### III.  DECISION OF THE ALJ

The ALJ found Hall suffered from diabetes mellitus with peripheral neuropathy, and that this impairment was severe, but that it did not meet the listing requirements. In particular, the ALJ found Hall's diabetes had not resulted in a significant and persistent disorganization of motor function. Hall showed no evidence of a disturbance in gross and dexterous movements. He walked with a cane and walker, but the ALJ found the necessity of these devices questionable, and most physical examinations showed a normal gait. Any problems with motor functioning, gait, or station were not persistent. The ALJ also found Hall suffered from osteoarthritis in his feet and left knee, but that this condition was not severe. In light of these impairments, the ALJ found Hall had the residual functional capacity (RFC) to occasionally lift and carry twenty pounds, and frequently lift and carry ten pounds. He could occasionally stoop, kneel, crouch, crawl, and climb stairs, but never climb ropes, ladders, or scaffolds. He was not

able to perform prolonged sitting, standing, or walking, and needed the flexibility to stand or sit. (Tr. 11-14.)

During the hearing, Hall testified, by telephone, from jail. His knees cracked and popped, and were painful. He also noted pain in his back, and constant burning in his legs. His most comfortable position was laying down, and he walked with an assistive device. The ALJ believed Hall's impairments could be expected to produce some of his alleged symptoms, but found the intensity, persistence, and limiting effect of these symptoms was not credible. X-rays of his chest were normal, x-rays of the hips, knees, ankles, and feet showed normal alignment without any fractures or abnormalities, though there was joint osteoarthritis. A stress test showed no ischemia. (Tr. 14-17.)

The ALJ discounted the opinions of Dr. LeBeau and the assessments of the state agency. Dr. LeBeau's assessment was to generate evidence for the social security appeal. In addition, Dr. LeBeau saw Hall infrequently, and his conclusions appeared to rest entirely on Hall's own subjective complaints. Finally, the ALJ criticized LeBeau's statements as conclusory, with little evidence cited in support. (Tr. 17.) The statements by the state agency were not made by an acceptable medical source. In addition, more recent evidence showed Hall had greater limitations than those found by the state examiner. (Tr. 17-18.)

The ALJ also found Hall not completely credible, and discounted his subjective complaints. First, his daily limitations could not be objectively verified with any certainty. Second, there was little medical evidence to support these complaints. During several medical visits, Hall had full range of joint motion, his blood sugar was under control, and he reported feeling well. He requested Viagra, and reported being sexually active, an indication Hall did not have the extreme pain he claimed. Hall's medication list did not support a finding of disability, and there was no allegation of any disabling side effects from the medication. Other than Dr. LeBeau, no physician had indicated Hall was disabled. Hall's relatively weak work history also detracted from his allegations. He had stopped working to care for his disabled wife, not because he suffered from any physical or mental

impairment of his own.  Indeed, Hall had received unemployment benefits after he stopped working, a fact inconsistent with an inability to work.  Finally, the ALJ noted that Hall's history of arrests and convictions further detracted from the credibility of his allegations. (Tr. 18-19.)

The ALJ found Hall was unable to perform his past work.  But relying on the testimony of the VE, the ALJ concluded that Hall had the RFC to work as a parking lot attendant or a cashier.  Because Hall was capable of performing work in the national economy, the ALJ concluded Hall was not disabled within the meaning of the Social Security Act. (Tr. 19-21.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's final decision complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen

v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id. If the claimant fails to meet the criteria at any step of the evaluation, the process ends and the claimant is determined to be not disabled. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006).

In this case, the Commissioner determined that Hall could not perform his past work, but that he retained the RFC to perform other work in the national economy.

## V. DISCUSSION

Hall argues the ALJ's decision is not supported by substantial evidence. First, he argues that the ALJ failed to properly consider his RFC. Second, he argues the ALJ failed to properly weigh the opinion of Dr. LeBeau. (Doc. 13.)

**Residual Functional Capacity**

Hall argues the ALJ failed to properly consider his RFC. In particular, he argues that substantial evidence does not support the ALJ's conclusion that his gait was usually normal, and that any "disorganization of motor functioning, or difficulties with gait or station, were not persistent." (Tr. 14.) The undersigned agrees.

The RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. Casey

v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Id. Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record. Casey, 503 F.3d at 697; Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Substantial evidence does not support the ALJ's determination that Hall's gait was usually normal. In November 2005, a physical examination showed Hall had an antalgic gait. In January 2006, doctors found Hall had a slow gait. In May 2006, a physical examination revealed Hall had an antalgic gait and could not walk on his toes or heels. In July 2006, emergency room notes indicated Hall needed to use a cane. Later that month, a doctor noted Hall had difficulty walking. In September 2006, Dr. Lorde found Hall had an antalgic gait. That same month, Dr. LeBeau found Hall had an antalgic gait, and experienced pain on the soles of his feet. A short time later, Dr. LeBeau certified that Hall needed therapeutic shoes, and wrote that Hall was to be fitted for a cane to improve his impaired gait. In December 2006, Dr. Clohisy and Dr. Sohn also found Hall had an antalgic gait. Finally, in February 2007, medical prison staff noted Hall walked with a halting, unsteady gait, and needed a cane for stability.

The government points to five pages in the record indicating Hall had a normal gait. Only one of these assessments comes from a physician, and in that case, the doctor merely checked a box indicating "gait normal." (Tr. 214); see Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."). The May 24, 2007 exam report did not state that he had a normal gait, but rather that he walked with a cane. (Tr. 406.) The final three citations came from Todd Parker, PA, with the Saint Louis County Department of Health. (Tr. 499, 542, 561.) A physician's assistant is not a licensed

physician or psychologist, and therefore not an "acceptable medical source," within the meaning of the federal regulations.  20 C.F.R. § 404.1513(a).  Moreover, his contact with Hall was limited to three unique visits in the prison setting, over a forty-day period.  <u>See</u> 20 C.F.R. § 404.1527(d) (noting the importance of the length, nature, and extent of a treating relationship).

Looking to the record, substantial evidence does not support the ALJ's determination that Hall's gait was usually normal.  Instead, substantial evidence in the record indicates Hall's gait was usually antalgic, slow, or otherwise impaired.  The ALJ's decision, therefore, must be remanded.

**Weighing Medical Opinion**

Hall argues the ALJ failed to properly weigh the opinion of Dr. LeBeau.  In particular, he argues that the ALJ erred by discounting the disability assessment Dr. LeBeau completed on June 19, 2007.  The undersigned disagrees.

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians.  <u>Pearsall</u>, 274 F.3d at 1219.  The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole.  <u>Id.</u>  Normally, the opinion of the treating physician is entitled to substantial weight.  <u>Casey</u>, 503 F.3d at 691.  The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight.  <u>Singh v. Apfel</u>, 222 F.3d 448, 452 (8th Cir. 2000).

Still, the opinion of the treating physician is not conclusive in determining disability status, and must be supported by medically acceptable clinical or diagnostic data.  <u>Casey</u>, 503 F.3d at 691.  The ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent.  <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 803 (8th Cir. 2005); <u>Cantrell v. Apfel</u>, 231 F.3d 1104, 1107 (8th Cir. 2000).  In determining how much weight to give a treating physician's opinion, the

ALJ must consider the length of the treatment relationship and the frequency of examinations.  <u>Casey</u>, 503 F.3d at 692.

Dr. LeBeau was one of Hall's regular physicians, having evaluated him in August 2006, September 2006, October 2006, and again in December 2006.  However, Dr. LeBeau completed the disability claim form in June 2006, nearly six-months after his most recent examination of Hall.  <u>See</u> <u>Hunter v. Barnhart</u>, 210 F. App'x 753, 757 (10th Cir. 2006) (order and judgment) (discounting a doctor's conclusions where, among other reasons, the form had been completed nine months after the doctor's most recent examination); <u>see also</u> <u>Swann v. Astrue</u>, No. 3:07CV129/LAC/EMT, 2008 WL 818500, at *10 (N.D. Fla. Mar. 26, 2008) (discounting a doctor's conclusions where, among other reasons, the form had been completed three months after the doctor's most recent examination).  In addition, Dr. LeBeau's answers on the one-page form were short answers, with no medical support or analysis to support the summary conclusions.  <u>See</u> <u>Browning v. Sullivan</u>, 958 F.2d 817, 823 (8th Cir. 1992) (noting that a conclusory diagnosis letter does not overcome substantial evidence to the contrary).  Given the absence of recent treatment, and the conclusory nature of Dr. LeBeau's answers, the ALJ did not err in discounting the disability assessment Dr. LeBeau completed on June 19, 2007.

**Employment Benefits**

In the decision, the ALJ noted that Hall received unemployment benefits <u>after</u> he stopped working. (Tr. 19.)  However, Hall's testimony during the hearing indicated he applied for disability benefits <u>before</u> he began working at Outback Steak House, but that he did not apply for unemployment benefits after he stopped working there. (Tr. 28.)  Unless there is evidence to contradict Hall's testimony, the ALJ should reconsider this statement on remand.

<u>**VI.  RECOMMENDATION**</u>

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed and remanded under Sentence 4 of 42 U.S.C. § 405(g).  On

remand, the ALJ should reconsider Hall's RFC. The ALJ should also reconsider the statement that indicated Hall collected disability benefits after he stopped working.

The parties are advised that they have ten days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.


        /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on August 17, 2009.